IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

AARON L. THORNE PLAINTIFF

v. Civil No. 2:25-CV-02053-TLB-MEF

FRANK J. BISIGNANO, Commissioner,
Social Security Administration DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Aaron Thorne, brings this action under 42 U.S.C. § 405(g), seeking judicial review of the denial of his application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434 (hereinafter "the Act"). The Court's task on judicial review is to determine whether substantial evidence supports the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I. Procedural Background

Plaintiff filed his application for disability benefits on May 23, 2023, alleging he had been unable to work since June 15, 2021, due to post traumatic stress disorder ("PTSD"), major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), degenerative disc disease, degenerative joint disease, irritable bowel syndrome, sleep apnea, and migraines. (ECF No. 6, pp. 42, 206-215, 276-284). Plaintiff was 44 years old on the alleged disability onset date and had a bachelor's degree. (*Id.*, pp. 206, 278, 374). He had past relevant work as a computer security officer. (*Id.*, pp. 54, 65-66, 270-271, 279, 285-286).

Plaintiff's claim was denied at the initial level of administrative review, and on reconsideration. (ECF No. 6, pp. 87-104). He sought an administrative hearing, which was held before Administrative Law Judge ("ALJ") Bill Jones on December 5, 2024. (*Id.*, pp. 42, 62-86,

130-131). Plaintiff appeared by telephone and was represented by an attorney, Laura McKinnon. (*Id*., pp. 42, 62, 64). Both Plaintiff and a vocational expert ("VE"), Rachel Hawkins, testified. (*Id*., pp. 42, 65-85).

In support of his claim, Plaintiff testified about the effects of his impairments during the relevant period. He said his PTSD, with symptoms of depression and anxiety, made it difficult to comprehend rules, regulations, and policies. (ECF No. 6, p. 67). He related these impairments to military service in Afghanistan and said he saw a psychiatrist at least once every quarter, sometimes once a month if medication changes were necessary. (*Id*., pp. 67-68). He said his medications and recent treatment had helped somewhat but not "100 percent" or "long enough." (*Id*., p. 68). He also indicated he did not get out of the house much because irritable bowel syndrome required that he remain near a bathroom, and knee surgery a year earlier had left him sedentary, with pain, swelling, and the need to elevate his leg. (*Id*., pp. 70-73). In addition, he had unpredictable migraines, which were tied to anxiety and occurred one or two times a week, lasted a half day, and required that he lie down in a dark room. (*Id*., pp. 73-74). He said his anxiety also prevented him from driving longer than twenty minutes, and on a bad day, he wakes up mad. (*Id*., pp. 74-75). He said he was experiencing suicidal ideation almost daily. (*Id*., p. 75).

On December 12, 2024, ALJ Jones determined that Plaintiff met the insured status requirements through December 31, 2025, and had not engaged in substantial gainful activity since June 15, 2021. (ECF No. 6, p. 44-45). He then found Plaintiff's degenerative disc disease, left knee pain (status post arthroscopic repair), hypertension, and obstructive sleep apnea were severe medically determinable impairments. (*Id*., p. 45). ALJ Jones found that Plaintiff's other impairments, including irritable bowel syndrome, headaches, post-traumatic stress disorder, ADHD, depressive disorder, and generalized anxiety disorder were not severe. (*Id*., p. 45).

After concluding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, but he could only frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; and he must avoid concentrated exposure to vibration and hazards, such as dangerous machinery and unprotected heights. (ECF No. 6, pp. 46-54).

The VE classified Plaintiff's past relevant work as a computer security specialist. (ECF No. 6, p. 65). Relying on Plaintiff's testimony and his work history report, as well as the VE's testimony, ALJ Jones compared Plaintiff's RFC with the physical and mental demands of his past relevant work. (*Id*., pp. 54-55, 65-66, 83, 285, 288). He found that, despite his impairments, Plaintiff could perform his past work as it is generally performed in the national economy and, thus, was not disabled. (*Id*., pp. 54-55).

In February 2025, Plaintiff sought review by the Appeals Council and supplied additional evidence, including a mental RFC ("MRFC") assessment from his psychiatrist, Dr. Venkata Dalai. (ECF No. 6, pp. 8-38, 203-204). The Appeals Council denied Plaintiff's request for review on March 18, 2025, noting that the additional evidence did not show a reasonable probability that it would change the outcome of the decision. (*Id*., pp. 1-6). Plaintiff filed this action on May 16, 2025. (*Id*., p. 2). Both parties have filed appeal briefs (ECF Nos. 8, 10), and the matter is ready for Report and Recommendation.

## II. Applicable Law

On judicial review, a federal court must affirm the decision of the ALJ if it is supported by substantial evidence on the record as a whole. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir.

2010). In making this determination, the court considers evidence that detracts from the ALJ's decision, as well as evidence that supports it. *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016). The threshold for substantial evidence is not high. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). It requires "only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Kijakazi*, 22 F.4th 769, 771 (8th Cir. 2022) (quotation omitted). This "standard allows considerable latitude to administrative decision makers" and "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Thus, if the decision is supported by substantial evidence on the record as a whole, it must be affirmed even if substantial evidence also exists for the opposite decision. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

A claimant for Social Security disability benefits bears the initial burden of proving his disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(5) (stating that an individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

To decide a claim of disability, the Commissioner's regulations require the application of a five-step sequential process to determine: (1) whether the claimant has engaged in substantial

gainful activity since filing the claim; (2) whether he has a severe physical or mental impairment or combination of impairments; (3) whether any such impairments meet or equal a listed impairment; (4) whether the claimant's impairment-related limitations prevent him from performing past relevant work; and, if so, (5) whether he is able to perform other work in the national economy, considering his age, education, and work history. 20 C.F.R. § 404.1520(a)(4).

## III. Discussion

Plaintiff presents four issues in this appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were not severe; (3) whether substantial evidence supports the RFC determination; and (4) whether the ALJ properly found Plaintiff could perform his past relevant work. After careful consideration of the record as a whole, the undersigned finds that substantial evidence supports the ALJ's decision to deny benefits.

### A. Development of the Record

Disability proceedings are non-adversarial, and an ALJ must ensure neutral development of facts sufficient to determine whether a claimant is disabled. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). If the record does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work, the ALJ's failure to obtain and consider more evidence may require reversal. *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012). Reversal is only warranted, however, if the failure to develop the record is unfair or prejudicial. *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001).

Plaintiff argues that the ALJ committed reversible error by not ordering a mental status consultative examination ("MSCE") to determine the effects of his mental impairments on his ability to function in the workplace. He contends that a consultative examination was necessary,

given that the state agency psychological consultants did not review all relevant treatment records when they rendered their assessments and given that the ALJ did not have the benefit of Dr. Dalai's MRFC assessment, which was submitted to the Appeals Council after the ALJ's decision. (ECF No. 8, pp. 7-11).

Here, no MSCE was required because the ALJ had sufficient medical and other evidence to allow an informed decision about the severity of Plaintiff's mental impairment(s). The administrative record documents Plaintiff's medical encounters during the relevant period at Mercy Hospital, Mercy Clinic River Valley Orthopedics, Seubold Chiropractic Clinic, Mercy Clinic Behavioral Health, Mercy Clinic Ophthalmology, and Veterans Administration Medical Centers ("VAMC"). (ECF No. 6, pp. 388-1309). As Plaintiff acknowledges, these records include, *inter alia*, progress notes from Dr. Dalai, who documented numerous clinical examinations of Plaintiff from April 2022 to April 2024. (ECF No. 8, p. 10; ECF No. 6, pp. 395-608, 1183-1190). They also document clinical examinations of Plaintiff by Dr. Sean Baker, a primary care provider who managed Plaintiff's medications for chronic conditions and coordinated care with Dr. Dalai. (ECF No. 6, pp. 396-400, 1124-1128, 1212-1213). And they include a note of a Mental Health Initial Evaluation, which Plaintiff underwent at the VAMC in June 2022, as well as two physical and mental assessments completed by agency medical and psychological consultants. (*Id.*, pp. 88-104, 974-981).

That the agency psychological consultants did not have all of Plaintiff's medical records when they completed their mental assessments does not require further development where, as here, the ALJ has expressly taken that into account when considering the assessments and has conducted an independent review of all the evidence, including evidence that was not considered by the agency consultants. *See Mangrich v. Colvin*, 2016 WL 593621, at 8 (N.D. Iowa Feb. 12,

2016) (rejecting argument that reliance on the state agency experts' opinions required further record development because they had not reviewed later records and because the treating source opinion had been rejected); *Perry v. Colvin*, No. 13-cv-1185-JNE-TNL, 2014 WL 4113015, at 57–58 (D. Minn. Aug. 20, 2014) (ALJ may rely on the opinion of a state agency medical consultant who did not have access to all of the records, so long as the ALJ conducts an independent review of the evidence, including that evidence not considered by the consultant).

Further, the ALJ did not "improperly translate[]" Dr. Rachel Morrisey's severity finding on reconsideration at the administrative level. (ECF No. 8, p. 8). Both Dr. Jennifer Williams and Dr. Morrisey considered the medical evidence supporting Plaintiff's mental impairment(s) at that time, and their narratives state that there was sufficient symptom information and detail of symptom severity in those records to assess Plaintiff's adaptive functioning. Dr. Morrisey noted, however, that Plaintiff complained of no new or changed conditions on reconsideration, and the new outpatient note Plaintiff submitted concerned only his physical impairment(s). Dr. Morrisey's efforts to contact Plaintiff for current information were unsuccessful, and she thus concluded there was insufficient evidence because Plaintiff did not respond. *See* 20 C.F.R. 404.1516 ("If you do not give us the medial and other evidence that we need and request, we will have to make a decision based on information available in your case."). Thus, the designation of Plaintiff's depressive disorder as "severe" on reconsideration appears to be a typographical error, as a determination of "severe" cannot be made until an adaptive functioning assessment and rating are made. *See* 20 C.F.R. 404.1520a(d) ("After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s)").

Regardless, an ALJ is "free to accept some, but not all, of a medical opinion." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (finding ALJ did not improperly ignore part of

medical opinion, as ALJ was free to accept some but not all of opinion, was not required to explicitly reconcile every conflicting shred of medical evidence, and properly evaluated overall persuasiveness of opinion). "[I]t is the ALJ's role to resolve conflicts in experts' opinions," including "conflicts ... internal to one expert's opinion." *Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir. 2005).

Finally, that the ALJ independently reviewed the evidence of record and made his decision without the benefit of Dr. Dalai's MRFC assessment does not render the ALJ's consideration of the evidence inherently improper, and Plaintiff has presented no persuasive argument that it was improper. First, there is no requirement that a severity assessment or an RFC assessment be supported by specific medical opinion evidence. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). An ALJ's assessment of functional limitations "may be based on reliable objective medical data such as clinical examinations … and need not include a medical professional's opinion regarding the claimant's functionality." *Bonham v. Bisignano*, 177 F.4th 934, 942 (8th Cir. 2026). *See also* 20 C.F.R. § 404.1520a(c)(1) (when rating the degree of functional limitation, "[w]e will consider all relevant and available clinical signs…."). Second, because the Appeals Council considered Plaintiff's new evidence and declined his request for review, Dr. Dalai's MRFC assessment is now part of the administrative record. *See Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th Cir. 1992) (noting that once the evidence is submitted to the Appeals Council, and it considers the new evidence but declines to review the case, the new evidence becomes part of the record). Accordingly, this Court must "review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." *Id.*

When evaluating the relevant evidence, the ALJ may properly conclude that objective medical findings and other evidence constitute sufficient medical support for an RFC finding, even in the absence of any medical opinion evidence directly addressing the claimant's ability to function in the workplace. *See Hensley*, 829 F.3d at 929-34. Given the robust record, including objective and other medical evidence, opinion evidence, and Plaintiff's reported functionality, which demonstrates functioning over time and in varied settings, the undersigned finds no reversible error as to the ALJ's development of the record and the denial of Plaintiff's request for a psychological consultative examination.

**B. Whether Substantial Evidence Supports the ALJ's Finding that Plaintiff's Mental Impairments Were Not Severe**

Plaintiff argues that the ALJ erred in finding that the medically determinable impairments of PTSD, depression, anxiety, and ADHD, considered singly and in combination, were not severe impairments. (ECF No. 8, pp. 11-12). The undersigned disagrees.

It is the claimant's burden to establish that his medically determinable impairment or combination of impairments is severe. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). Although severity is not an onerous requirement for the claimant to meet, it also is not a toothless standard. *See Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007). An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). Here, Plaintiff points to evidence that he has received treatment for his mental impairments (ECF No. 8, pp. 11-12), but he does not address the relevant medical and other evidence the ALJ analyzed relative to the assessment of Plaintiff's functioning. (ECF No. 6, pp. 45-46, 48-52).

To determine the severity of a claimant's medically determinable mental impairments, an ALJ first must consider all relevant evidence, as the ALJ did here, including clinical signs and

findings, the effects of the claimant's symptoms, and how his functioning may be affected by factors such as medication and other treatment. *See* 20 C.F.R. § 404.1520a(c)(1). The ALJ then will "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas (the Paragraph B criteria). *Id*., §404.1520a(b)(2), (c); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1. Only then can the ALJ determine the severity of a claimant's impairment(s). *See id*., § 404.1520a(d). A rating of "none" or "mild" will generally result in a conclusion by the ALJ that the mental impairment is not severe, unless the evidence otherwise indicates there is more than a minimal limitation in the claimant's ability to perform basic work activities. *Id*., § 404.1520a(d)(1).

Here, the ALJ applied the foregoing technique, and he provided a thorough review of the medical and other evidence of record. He determined that Plaintiff's impairment(s) caused no more than "mild" limitation in each of the broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and in adapting or managing oneself. (ECF No. 6, pp. 45-46). He further concluded that the evidence did not otherwise indicate that there is more than a minimal limitation in Plaintiff's ability to do basic work activities and found the mental impairment(s) were not severe. (*Id*.).

In a Function Report filed on July 28, 2023, Plaintiff indicated his conditions affect his understanding, getting along with others, memory, completing tasks, and concentration, but he needed no reminders to tend to personal care medication. He and his wife have to organize his medications to be sure he takes them at the right times. (ECF No. 6, pp. 45-46, 296, 298, 300-301). The ALJ observed that his medical records reflect that he was able to relay necessary information to treatment providers and follow through with treatment recommendations. He was

noted to interact properly with his treating medical providers and to have good eye contact. His mental status evaluations showed fair attention and concentration with no memory deficits noted by his providers; his insight and judgment were noted to be good; and his hygiene, grooming, and attire were appropriate. (ECF No. 6, p. 46).

During an encounter with Mercy Primary Care in November 2021, Plaintiff's depression screening was negative, and he indicated he had no mood swings or sleep disturbance. (ECF No. 6, pp. 522-525). At a telehealth follow-up with Dr. Dalai at Mercy Behavioral Health in February 2022, Plaintiff reported his mood had been stable and his sleep had improved after the adjustment of his CPAP settings at the clinic. His anxiety was noted to be "pretty much" under control. (*Id*., p. 511). A mental status examination showed Plaintiff to be dressed appropriately, with good hygiene and grooming. He made good eye contact, was pleasant and cooperative, and his mood was euthymic, his attention span and concentration fair. He was able to attend to the conversation, demonstrated goal directed and appropriate thought process and content, with good insight and judgment. (*Id*., pp. 511-512). At a telehealth follow-up two months later, Plaintiff reported sleep difficulties, weight gain, and concerns that his CPAP settings might need to be changed. His mental status examination was unchanged, and he reported his mood and anxiety had been stable. His primary concern was sleep, and he was encouraged to work on weight loss and contact his sleep provider about eligibility for BiPap. (*Id*., pp. 499-500).

In May 2022, Plaintiff initiated care at the Veterans Administration Medical Clinic ("VAMC"), and indicated he was considering transferring his medication management for his PTSD, depression, anxiety, and insomnia. (ECF No. 6, pp. 983-989). On June 2, 2022, he was seen for an initial mental-health consult with a social worker at the VAMC, and screening measures indicated severe depression and severe anxiety. A mental-status examination reflected that he was

dressed appropriately, with adequate hygiene and grooming. He described his mood as "cranky" and "grumpy," and his affect was low. He demonstrated intact concentration, good insight and judgment, and his thought process was logical, linear, and goal directed. (ECF No. 6, pp. 974-982).

At a telehealth visit with Mercy Behavioral Health on October 5, 2022, Plaintiff inquired about rTMS and was put on a waitlist for it. He underwent thirty-six sessions of this treatment with a clinic technician between January 10, 2023, and March 13, 2023. (ECF No. 6, pp. 404-461, 474). On March 13, 2023, Plaintiff was assessed with "recurrent major depressive disorder, in remission," and his care plan stated he had "completed … TMS with significant improvement in mood." (*Id*., pp. 404-405). At an appointment with Dr. Dalai on April 5, 2023, Plaintiff rated his mood as 8/10, and his only symptom of depression was not wanting to get out of bed in the morning. He had no symptoms once he got out of bed. He indicated that his PTSD symptoms also had improved after rTMS treatment, and his sleep had improved with a nasal CPAP mask. He reported elevated anxiety due to planning a trip to Moab, Utah with a friend. His mental status examination indicated a pleasant and cooperative attitude, good hygiene and grooming, appropriate attire, and good eye contact. His mood was euthymic, and his affect normal. His attention and concentration were fair, and his insight and judgment were good. (*Id*., pp. 400-403).

Plaintiff did not see Dr. Dalai again until ten months later, on February 8, 2024. In the interim, he saw his primary care physician, Dr. Sean Baker, in April and October 2023, for routine follow-up of chronic conditions. He was noted to be tolerating his depression medications well, denied mood swings or suicidal ideation, and his depression screenings were negative. (ECF No. 6, pp. 396-400, 1124-1128). Similarly, on January 16, 2024, Plaintiff denied new or worsening symptoms of depression and denied any recent anxiety attacks or mood swings. He continued to

take his ADHD medication, denied side effects, and said his focus was good and he was able to stay on task. (*Id*., pp. 1212-1213).

On February 8, 2024, Plaintiff followed up with Dr. Dalai for PTSD, depression, anxiety, ADHD, chronic insomnia and obstructive sleep apnea on CPAP. (ECF No. 6, pp. 1187-1190). He was noted to be taking Adderall, Wellbutrin, and Klonopin as needed. He reported compliance with his medications and denied side effects. His chief concern was insomnia, and he was thinking about another sleep study. He was struggling with concentration and short-term memory and said his sleep provider thought overmedication might be affecting his cognitive status. They were working together on reducing some medications. (*Id*., pp. 1153-1154). Plaintiff said he was easily distracted and struggled with driving and word finding. His depression was much better overall. A mental status examination reflected appropriate appearance and attitude, with good eye contact, fair attention span and concentration, with the ability to attend to the conversation, and good insight and judgment. His mood was anxious with congruent affect. Dr. Dalai recommended Plaintiff follow up with his sleep provider and use the CPAP regularly. He also recommended the addition of Vraylar to Plaintiff's regimen for mood stabilization, and Plaintiff was to follow up in 6 to 8 weeks. (*Id*., pp. 1187-1190).

Plaintiff followed up on April 18, 2024, as scheduled, and expressed concerns about his anxiety medication. He said his anxiety was not "freezing" him but was always present, that he struggled with social speaking, which could make him angry and irritable. He denied panic attacks and said he knew clonazepam calms him when he is severely anxious, but he was unsure how helpful it was. He reported being fidgety, restless and unable to relax. His mental status examination was unchanged. Dr. Dalai prescribed a trial of propranolol for two or three weeks and noted that, depending on its effect, an alternative anxiolytic or SSRI/SNRI medication could

be considered. Plaintiff was noted to be interested in GeneSight, and a blood sample was obtained. Dr. Dalai also noted that Plaintiff had lost a significant amount of weight with the help of Wegovy and was concerned about side effects of the medication on mental health. He provided reassurance to Plaintiff.

As noted, the ALJ found the foregoing and other evidence demonstrated no more than mild limitations in the broad areas of functioning. In support of his argument that the ALJ's finding is erroneous, Plaintiff refers to evidence that he receives disability benefits through the Department of Veterans Affairs. (ECF No. 8, pp. 11-12; ECF No. 6, p. 254). He further notes that his mental-health treatment has included medications and repetitive transcranial magnetic stimulation ("rTMS").[1] (ECF No. 8, p. 12).

Concerning Plaintiff's VA disability benefits, ALJ Jones considered this evidence and properly noted that it was non-binding and inherently neither valuable nor persuasive because VA benefits decisions are based on different rules than those used by the Social Security Administration. (ECF No. 6, p. 52). *See* 20 C.F.R. §§ 404.1504; 404.1520b(c)(1). Mindful that the ALJ properly considered and rejected this evidence, the undersigned notes that during the period under review here, the VA denied Plaintiff's request for a rating increase related to PTSD with depression and denied his request for a determination of unemployability due to PTSD with depression and physical impairments. Plaintiff's request for a rating increase was denied because the VA determined the condition of PTSD with depression had not increased in severity

[1] Transcranial magnetic stimulation is a non-invasive procedure that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of major depression and other conditions. When used for depression, the treatment involves delivering repeated magnetic pulses through an electromagnetic coil placed against the scalp, which stimulates nerve cells in the region of the brain involved in mood control and depression and is thought to activate regions of the brain that have decreased activity during depression. https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulation/about/pac-20384625 (last accessed July 25, 2026).

sufficiently to warrant a higher rating under VA rules. Regarding the VA's denial of Plaintiff's separate request for a determination of unemployability, Plaintiff was informed that the VA had been:

> unable to find clinical evidence that the severity of your service-connected conditions would preclude you from securing or following any substantially gainful occupation. Based on your prior work history, educational level and the limitations imposed by your posttraumatic stress disorder, right should strain, right knee joint osteoarthritis and lumbosacral strain, we have determined that you do have the residual functional capacity to perform the requirements of your past relevant work. You have past relevant work as an Information Systems Security Officer. The demands of your past relevant work do not exceed the residual functional capacity. Thus, your claim for entitlement to individual unemployability has been denied.

(ECF No. 6, p. 271).

Regarding the remainder of Plaintiff's argument, the ALJ thoroughly considered the medical evidence of record, including the evidence of Plaintiff's mental-health treatment with medications managed by Dr. Dalai, and the interval of treatment with rTMS at Dr. Dalai's clinic. Plaintiff points to no evidence that demonstrates his mental impairment(s) cause more than mild limitations or otherwise indicates more than a minimal effect on his ability to work. Accordingly, the ALJ did not err in finding Plaintiff's mental impairment(s) are not severe.

**C. Whether Substantial Evidence Supports the RFC Assessment**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his RFC. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records,

observations of treating physicians and others, and a claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

In addition to the medical evidence discussed in previous sections, the ALJ considered the following evidence when formulating Plaintiff's RFC. Plaintiff began experiencing left knee pain in 2022, and magnetic resonance imaging ("MRI") of his left knee showed some degenerative changes in his medial meniscus. (ECF No. 6, p. 465). On August 24, 2023, Plaintiff underwent a left knee arthroscopy with partial medial and lateral meniscectomy and abrasion chondroplasty of the trochlear groove and medial femoral condyle. He also underwent microfracture of the trochlear groove and medial femoral condyle with removal of loose body. (*Id*., pp. 1057-1058). At a post-surgery follow-up exam on October 11, 2023, the claimant was walking well. He stated the surgery helped tremendously. His exam showed full extension of the knee with no instability, effusion or diffuse joint line tenderness. (*Id*., pp. 1160, 1161). In July 2024, Plaintiff again sought treatment for knee pain, and stated he was getting ready to go on vacation and wanted to be sure it was okay before he traveled. (*Id*., p. 1198). The ALJ noted that Plaintiff complained of knee pain after a trip to Colorado. (*Id*., pp. 51, 78-79, 1260). An x-ray of Plaintiff's left knee showed mild degenerative change with joint effusion. (*Id*., pp. 1196-1197).

Dr. Baker saw Plaintiff on October 12, 2023, for follow-up of his chronic conditions. Plaintiff had lost weight and was having some low blood pressure readings with dizziness on standing. His losartan was discontinued, and his home readings were 117/80s. A depression screening was negative. His physical examination was unchanged. (ECF No. 6, p. 1012).

During an office visit with Dr. Baker on January 16, 2024, Plaintiff reported no new or worsening depression symptoms. He denied recent anxiety attacks or mood swings. He continued

to experience fatigue and was scheduled for a sleep study. His ADHD medication was beneficial with no side effects. He reported a good focus and was able to stay on task. A depression screening was negative. (ECF No. 6, pp. 1211-1217).

Plaintiff returned to Dr. Baker on July 12, 2024, with complaints of left knee pain. He noted his knee surgery a year ago but recently had injured his knee and had edema and pain with certain movements. Plaintiff was getting ready to go on vacation and wanted to make sure he was okay to travel. X-rays showed mild degenerative changes of the left knee with joint effusion. (ECF No. 6, pp. 1195-1202).

At an orthopedics appointment on August 5, 2024, Plaintiff was again seen for knee pain. He stated he had recently gone on a trip to Colorado and had knee pain for the past one to two months with pain and swelling with activity. His pain improved with rest. He noted he had tried naproxen and a brace. An exam showed mild pain with varus and valgus stress. He had mild pain with deep flexion and no pain with extension. There was moderate to severe tenderness to palpitation in the medial joint line. He was assessed with moderate to severe osteoarthritis of the left knee and underwent a Synvisc injection. August 6, 2024, x-rays revealed mild degenerative narrowing of the medial compartment and small joint effusion. At an August 23, 2024, tele-visit, Plaintiff reported good improvement with the injection and was happy with the results. He still had some pain and tightness with flexion. (ECF No. 6, pp. 1057-1058).

The ALJ also considered Plaintiff's daily activities. Plaintiff lives in a house with his family. He can tend to his personal care needs but noted that he has to sit or recline to get dressed, and his back and shoulder pain interfere with his ability to reach when bathing or wiping. Plaintiff prepares simple meals such as sandwiches and does household chores such as loading and unloading the dishwasher and laundry. He can drive a car. His hobbies include watching television

and movies daily. He goes off-road driving once or twice a year. He spends time with his family at holidays and birthdays. The record indicates that Plaintiff went off-roading with friends and drove to Colorado during his son's spring break. The ALJ concluded that Plaintiff's ability to perform these kinds of activities suggested he was not as limited as alleged. (ECF No. 6, pp. 51, 53).

The ALJ also considered the assessments of state agency consultants. On October 25, 2023, state agency medical consultants, Drs. Jennifer Weber Williams and Brett Alberty, reviewed the records and found Plaintiff capable of performing work at the light exertional level. The alleged mental impairments were found to be non-severe. On February 20, 2024, Drs. Rachel Morrissey and Darrin Campo, state agency medical consultants, reviewed the record at the reconsideration level and determined that the claimant could perform work at the light exertional level. He could occasionally climb ropes, ladders and stairs and frequently climb ramps and stairs. He could frequently balance and stoop and occasionally kneel, crouch and crawl. He had to avoid concentrated exposure to vibration and hazards. They found insufficient evidence to rate the severity of the alleged mental impairments.

Plaintiff argues that the ALJ's decision does not contain an adequate discussion of Plaintiff's MRFC, and he faults the ALJ for not discussing Dr. Dalai's medical source opinion. The ALJ could not consider the MRFC because Plaintiff did not provide Dr. Dalai's MRFC to the ALJ. Although the MRFC indicates that Dr. Dalai signed it on December 11, 2024, it was not printed until December 13, 2024, the day after the ALJ issued his decision, and it was not supplied to the Appeals Council until February 2025. As previously noted, however, the MRFC is part of the record under review here. (ECF No. 6, p. 37).

The undersigned has carefully reviewed the MRFC as well as the progress notes dated November 6, 2024, which were submitted with the MRFC. (ECF No. 6, pp. 16-37). The MRFC suggests Plaintiff has no useful ability to function in numerous areas during a full work week, such as maintaining attention and concentration over time, to be punctual, perform activities within a schedule, and maintain regular attendance. (*Id*., p. 37). The undersigned has also considered the references in Plaintiff's brief to what appear to be partial summaries of two progress notes that the ALJ considered in his decision. (ECF No. 6, pp. 50-51; ECF No. 8, pp. 17-18). Though Plaintiff has not included the dates of these summarized progress notes, they appear to be from encounters in February and April 2024, well before Dr. Dalai signed the MRFC, which uses checkboxes to mark the extreme limitations, with no substantive support in the document itself. (ECF No. 6, p. 37). The mental status examinations are omitted from the summaries in Plaintiff's brief, but they are in the record, and they reflect anxious mood and congruent affect, as well as good judgment and insight, fair attention and concentration, and good eye contact, and they suggest elevated anxiety is due to planning a trip with a friend to Moab. (*Id*., pp. 401-402). The details of these encounters, as previously discussed, reflect Plaintiff's ability to function and convey necessary and relevant information to his providers.

The undersigned also notes the November 6, 2024, progress note, which includes two undated self-report screening measures for depression and anxiety symptoms over a two-week period preceding the completion of the forms. (ECF No. 6, pp. 35-36). The undersigned will assume the forms were prepared on the date of the progress note. This record says little about the encounter, however, stating only that it was a "follow up" and that Plaintiff was diagnosed with generalized anxiety disorder, for which he was prescribed a thirty-day supply of diazepam. (*Id*., 31). He was instructed to take one five-milligram tablet twice daily as needed for anxiety. This

record contains no mental status examination findings. Notably, it does reflect that Plaintiff's anxiety disorder is not chronic, that his recurrent major depressive disorder is still in remission, and that his obesity and intractable headaches have been resolved. (*Id.*, pp. 24-25). Considering the record as a whole, the undersigned finds the limitations endorsed by the MRFC are without sufficient support and are inconsistent with the medical and other evidence over time. The undersigned finds the MRFC is not persuasive.

The undersigned further finds that the ALJ's decision provides a sufficient basis to understand why he did not include Plaintiff's mild limitations in the RFC. If the ALJ determines that a non-severe impairment does not affect a claimant's ability to work, the ALJ does not need to include the impairment in the RFC. *Rose v. Apfel*, 181 F.3d 943, 945 (1999); *Pulido v. Kijakazi*, No. 4:20-CV-00964, 2021 WL 5236495, at 2 (W.D. Mo. Nov. 10, 2021) (citing *Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004)). The ALJ discussed medical evidence pertaining to Plaintiff's mental limitations at step two after considering all the evidence. The ALJ also discussed Plaintiff's activities, as reflected in the records, going off-roading, driving to other states, interacting and conveying information effectively with his medical providers, and following his treatment plan, for example.

Plaintiff also argues that his back and knee pain combined with his obesity would affect his ability to perform light work. (ECF No. 8, p. 15). Plaintiff was referred to a weight loss program at the Department of Veterans Affairs, which he successfully completed. (ECF No. 6, pp. 1278, 1281). Dr. Griffey opined that Plaintiff's knee surgery "helped him tremendously," and Plaintiff could do daily activities, and travel out of state once or twice a year for off-road driving trips with his friends. (*Id.*, pp. 51, 76-78, 1160-1161). ALJ Jones also accounted for Plaintiff's knee pain by including additional postural limitations in the RFC finding. (*Id.*, p. 46). Plaintiff

has failed to establish that he had functional limitations exceeding those limitations the ALJ set forth in the RFC. Plaintiff has the burden of persuasion to prove disability and to demonstrate RFC. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

Plaintiff also argues his migraine headaches should have been deemed a severe impairment, but the record contains no objective testing despite Plaintiff's request for referral, and Plaintiff could control his migraine headaches with medication. (ECF No. 6, p. 485). In a July 2023 visit, Dr. Baker stated that Plaintiff's current medication for his migraines was effective, and they were reduced to once weekly. (*Id*., pp. 620-621).

**D. Whether the ALJ Properly Found that Plaintiff Could Perform his Past Relevant Work**

In his final point, Plaintiff argues that the ALJ erred at step four when he found Plaintiff could return to his past relevant work as a computer security specialist, as it was generally performed in the national economy. At step four in the evaluation process, Plaintiff bears the burden to show that he cannot perform his past relevant work. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). If he can perform his past relevant work, either as he actually performed it or as the position is generally performed in the national economy, then he is not "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(f), 404.1560(b).

The ALJ relied on Plaintiff's Work History Report, his testimony at the administrative hearing, and the testimony of the VE when determining the physical and mental demands of Plaintiff's past work. (ECF No. 6, pp. 54-55, 65-66, 83). These sources are sufficient to evaluate and develop the record regarding the physical and mental demands of Plaintiff's past relevant work. *See* 20 C.F.R. § 404.1560(b)(2). Plaintiff argues that the ALJ incorrectly characterized his job at Summit Federal Services, LLC as a computer security officer, rather than a composite job

that includes work as an electronics mechanic. (ECF No. 8, pp. 19-20). The undersigned disagrees.

As the Commissioner asserts, a composite job includes significant elements of two or more occupations. *See* Social Security Ruling (SSR) 82-61, 1982 WL 31387, at 2. The VE did not state that Plaintiff's past work as a computer security specialist was a composite job, and the ALJ did not find that Plaintiff's past work was a composite job. (ECF No. 6, pp. 54-55). Rather, the VE testified that Plaintiff had past relevant work as a computer security specialist, which was classified as skilled sedentary work according to the *Dictionary of Occupational Titles* ("DOT"). (*Id*., pp. 65-66, 83). *See* DOT #033.362-010, 1991 WL 646561 (4th ed. 1991) (computer security officer). The VE testified that according to Plaintiff's Work Activity Report, he performed the job of computer security specialist at the medium exertional level. (*Id*., pp. 65-66, 288).

In his prehearing brief, Plaintiff noted that after he left the Air Force, he worked as an "IT/security officer" from 2018 to 2019. (ECF No. 6, pp. 374, 376). At the administrative hearing, he testified that he worked as an "information systems security officer" for Summit Federal Services, providing information and security services on the computer systems at the Air National Guard Base in Fort Smith.[2] (*Id*., p. 65). In his Work History Report, Plaintiff indicated he had worked eight hours a day, five days a week. (*Id*., p. 285). During his workday, he sat at a desk with a computer, interacted with people to ensure compliance with regulations, performed "physical walkaround checks" in the server room for multiple computer systems, enforced local, state, and federal policies and procedures, and prepared multiple security and software checks of

[2] Summit Federal Services, LLC, is a private government contractor that has supplied, *inter alia*, information systems security for the Air National Guard. *See* Projects | Explore Our Projects Today — Summit Federal Services, https://www.summitfederalservices.com/projects-portfolio (noting featured projects include information systems security for the Air National Guard in multiple states) (last accessed July 15, 2026).

computer systems. (*Id.*). He indicated this job did not require the use of machines, tools, or equipment but did require the use of technical knowledge or skills, writing, completing reports, and similar duties. He indicated that he frequently lifted ten pounds, occasionally lifted and carried computers, servers, and associated equipment, and the heaviest weight he had lifted in this job was fifty pounds. (*Id.*).

In response to the ALJ's hypothetical question, the VE testified that a person with the same age, education, and RFC as Plaintiff would be able to perform Plaintiff's past work as a computer security specialist as the job is generally performed, but not as actually performed. (ECF No. 6, p. 83). The ALJ properly relied on the vocational expert's testimony and found Plaintiff could perform his past relevant work as computer security specialist as generally performed. (*Id.*, pp. 54-55, 83).

Here, the DOT notes that a computer security officer's job falls within the category of "Occupations in Computer Systems Technical Support" and describes the responsibilities of this job as follows:

> regulates access to computer data files, monitors data file use, and updates computer security files: Enters commands into computer to allow access to computer system for employees who forgot password. Reads computer security files to determine whether denial of data access reported by employee is justified. Modifies security files to correct error or explains that employee authorization does not permit access. Answers employee questions about computer security. Modifies security files to add new employees, delete former employees, and change employee name, following notice received from computer user departments and personnel office. Sends printouts listing employee data authorization to computer user departments to verify or correct information in security files. Reviews data use records and compares usernames listed in records with employee authorization to ensure that all employees who accessed data files were entitled to do so. Deletes data access of unauthorized users, and for users who have not used data for specified time.

*DOT* § 033.362.010, 1991WL646561 (4th ed. 1991) (computer security officer). This is in keeping with Plaintiff's description of his job responsibilities. *Sloan v. Saul*, 933 F.3d

946, 950 (8th Cir. 2019) (affirming ALJ's decision that Plaintiff's past work was not a composite job where Plaintiff's description of her duties matched the description of that found in the *DOT*). In contrast, the electronics mechanic job Plaintiff suggests has relevance here falls within the category of "Electrical Assembling, Installing, and Repairing Occupations," and includes the use of tools, which Plaintiff indicated his job did not entail. (ECF No. 6, p. 288). The DOT describes the responsibilities of the job as follows:

> Repairs electronic equipment, such as computers, industrial controls, audio and video systems, radar systems, telemetering and missile control systems, transmitters, antennas, and servomechanisms, following blueprints and manufacturers' specifications, and using hand tools and test instruments: Converses with equipment operators to ascertain problems with equipment before breakdown, and to determine if breakdown is due to human error or mechanical problems. Tests faulty equipment and applies knowledge of functional operation of electronic units and systems to diagnose cause of malfunction. Tests electronic components and circuits to locate defects, using oscilloscopes, signal generators, ammeters, and voltmeters. Replaces defective components and wiring and adjusts mechanical parts, using hand tools and soldering iron. Aligns, adjusts, and calibrates equipment according to specifications. Calibrates testing instruments. Maintains records of repairs, calibrations, and tests. May enter information into computer to copy program from one electronic component to another, or to draw, modify or to store schematics, applying knowledge of software package used. May install equipment in industrial or military establishments and in aircraft and missiles. May operate equipment, such as communication equipment or missile control systems in ground and flight test and be required to hold license from governmental agency. May be designated according to type of equipment repaired as Customer-Engineering Specialist (office machines); Electronics Mechanic, Computer (any industry); Radar Mechanic (any industry); Voting-Machine Repairer (government ser.).

*DOT* § 828.261-022, 1991 WL 681803 (4th ed. 1991) (electronics mechanic).

There is no evidence in the record that Plaintiff's past relevant work was a composite job. ALJ Jones did not err by relying on the VE's testimony. Accordingly, substantial evidence supports the ALJ's finding that Plaintiff was not disabled because he retained the ability to perform his past work as generally performed. *See Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996); *see*

*also* SSR 82-61, 1982 WL 31387 at 2 (a claimant is not disabled if she can perform past relevant work as actually or generally performed).

## IV. Conclusion

For the reasons and upon the authorities discussed above, it is RECOMMENDED that the ALJ's decision be affirmed, and that Plaintiff's Complaint (ECF No. 2) be DISMISSED with PREJUDICE.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED on this 29th day of July 2026.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE